# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 15-20708-CR-SCOLA/OTAZO-REYES

UNITED STATES OF AMERICA,

PLAINTIFF,

-vs-

JESUS MANUEL RODRIGUEZ,

DEFENDANT.

---

## JESUS MANUEL RODRIGUEZ'S SENTENCING MEMORANDUM

---

CARLOS F. GONZALEZ
ALVAREZ | GONZALEZ, LLP
Museum Tower
150 West Flagler Street
Suite 1675
Miami, Florida 33150

*Counsel for Jesus Manuel Rodriguez*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION ............................................................................................................. 1

MEMORANDUM .............................................................................................................. 1

A.  The Law ............................................................................................................... 1

B.  This Court Should Grant Mr. Rodriguez A Downward Departure ....................... 2

   1.  Mr. Rodriguez Had Made Extraordinary Restitution ..................................... 2

   2.  The Loss Amount Overstates the Seriousness of the Offense ........................ 6

C.  This Court Should Also Grant Mr. Rodriguez A Downward Variance Based On the
    Section 3353(a) Factors ...................................................................................... 9

   1.  This Offense Represents a One-Time Aberration in an Otherwise Exemplary Life ....... 9

   2.  Mr. Rodriguez's Family Is Completely Dependent Upon His Support ......................... 13

   3.  The Nature and Circumstances of the Offense ............................................. 14

   4.  The Need for the Sentence Imposed ............................................................. 15

      a.  To Reflect the Seriousness of the Offense, to Promote Respect for the
         Law, and to Provide Just Punishment for the Offense ........................... 15

      b.  To Afford Adequate Deterrence to Criminal Conduct ......................... 16

      c.  To Protect the Public from Further Crimes by Mr. Rodriguez ............. 17

      d.  To Provide Jesus with Needed Educational or Vocational
         Training, Medical Care, or Other Correctional Treatment in
         the Most Effective Manner ..................................................................... 19

      e.  The Need to Avoid Unwarranted Sentence Disparities Among
         Defendants with Similar Records Who Have Been Found Guilty
         of Similar Conduct ................................................................................. 19

      f.  The Need to Provide Restitution to the Victims ................................... 20

CONCLUSION ................................................................................................................ 20

CERTIFICATE OF SERVICE ................................................................................................. 21

# TABLE OF AUTHORITIES

**Cases**

*Gall v. United States*,
    552 U.S. 38 (2007) ........................................................................................... 1

*Kimbrough v. United States*,
    552 U.S. 85 (2007) ........................................................................................... 1

*Molina-Martinez v. United States*,
    2016 WL 1574581 (2016) ................................................................................. 1

*U.S. v. Costello*,
    6 F. Supp. 2d 36 (D. Mass. 1998) .................................................................... 8

*U.S. v. Forchette*,
    220 F. Supp. 2d 914 (E.D. Wisconsin 2002) ................................................... 8

*U.S. v. Redemann*,
    295 F. Supp. 2d 887 (E.D. Wisconsin 2003) ........................................... 6, 7, 8

*United States v. Adelson*,
    441 F. Supp. Ed 506 (S.D.N.Y.) ...................................................................... 9

*United States v. Anderson*,
    533 F. 3d 623 (8th Cir. 2008) ........................................................................ 16

*United States v. Booker*,
    543 U.S. 220 (2005) ................................................................................... 1, 19

*United States v. Clay*,
    483 F. 3d 739 (11th Cir. 2007) ...................................................................... 20

*United States v. Conaster*,
    514 F. 3d 508 (6th Cir. 2008) ........................................................................ 19

*United States v. Corry*,
    206 F. 3d 748 (7th Circ. 2000) ........................................................................ 6

*United States v. Croteau*,
    2016 WL 1399456 (11th Cir. April 11, 2016) ............................................... 20

*United States v. Cubero*,
    754 F.3d 888 (11th Cir. 2014) ....................................................................... 20

iv

*United States v. DeMonte,*
   25 F. 3d 343 (6th Cir. 1994) ................................................................ 3

*United States v. Hayes,*
   762 F.3d 1300 (11th Cir. 2014) ......................................................... 2

*United States v. Johnson,*
   964 F. 2d 124 (2nd  Cir. 1992)..................................................... 1, 13, 14

*United States v. Kim,*
   364 F. 3d 1235 (11th Cir. 2004) ........................................................ 2

*United States v. Oligmueller,*
   198 F. 3d 669 (8th Cir. 1999) ......................................................... 6, 7

*United States v. Reinhart,*
   442 F. 3d 857 (5th Cir. 2006) ........................................................... 1

*United States v. Stuart,*
   22 F. 3d 76 (3d Cir. 1994)................................................................. 8

## Federal Statutes

18 U.S.C. § 1343 ............................................................................... 14

18 U.S.C. § 3553(a) ......................................................................... 1, 2

USSG §2B1.1(b)(1)(J) ........................................................................ 6

USSG §5H1.6, p.s ............................................................................. 13

## Other

U.S. Sentencing Commission, *Recidivism Among Federal Offenders:  A Comprehensive*
   *Overview*, at 5 (March 2016) ........................................................... 17

## INTRODUCTION

"The United States Sentencing Guidelines do not require a judge to leave compassion and common sense at the door to the courtroom."  *United States v. Johnson*, 964 F. 2d 124, 125 (2nd Cir. 1992).  The advisory Guidelines in this case recommend a sentence of 41 to 51 months in prison.  Compassion and common sense both dictate that this sentence, even at the low end of the Guidelines, is greater than necessary.  When applied to the unique facts of this case, the factors laid out in 18 U.S.C. § 3553(a) compel an alternative sentence.  As Mr. Rodriguez will demonstrate below, this Court should sentence him to probation with a term of confinement in the form of house arrest.

## MEMORANDUM

### A.  The Law

This Court should begin "by correctly calculating the applicable Guidelines range."  *Gall v. United States*, 552 U.S. 38, 49 (2007).  However, the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005) "instructed district courts to read the United States Sentencing Guidelines as effectively advisory."  *Kimbrough v. United States*, 552 U.S. 85, 91 (2007) (internal quotation marks and citation omitted).  Consistent with 18 U.S.C. § 3553(a), "the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining the appropriate sentence."  *Id*.  The Guidelines "are to be the sentencing court's 'starting point and . . . initial benchmark."  *Molina-Martinez v. United States*, 2016 WL 1574581 *7 (2016) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)).  This does not mean, however, that the Guidelines have "quasi-mandatory status."  *United States v. Reinhart*, 442 F. 3d 857, 864 (5th Cir. 2006).

1

"In imposing a sentence, a district court may not presume that the range produced by application of the Sentencing Guidelines is reasonable, and must consider the factors set out in 18 U.S.C. § 3553(a)." *United States v. Hayes*, 762 F.3d 1300, 1306 (11th Cir. 2014) (internal citations omitted). In so doing, the court must "make an individual assessment based on the facts presented." *Gall*, 552 U.S. at 50. If the court determines that a non-Guidelines sentence is appropriate, it must next consider the extent of the deviation.

As further explained below, this Court should downward depart from the advisory Guidelines range for two reasons. Mr. Rodriguez believes that he is entitled to a downward departure based on his extraordinary restitution and because the Guidelines' loss amount overstates the seriousness of his offense. Second, Mr. Rodriguez believes that this Court should grant him a downward variance based on the application of the factors codified in section 3553(a). The application of both the departures and 3553(a) variances should yield a sentence of probation with a term of confinement in the form of house arrest.

**B. This Court Should Grant Mr. Rodriguez A Downward Departure**

**1. Mr. Rodriguez Had Made Extraordinary Restitution**

In *United States v. Kim*, 364 F. 3d 1235, 1240 (11th Cir. 2004), the Eleventh Circuit joined the Second, Third, Fourth, Sixth, Seventh, Eighth, and Ninth Circuits in holding "that extraordinary restitution is not a prohibited factor" for purposes of a downward departure from the advisory Guidelines. Under *Kim*, this Court may consider the restitution Mr. Rodriguez paid both before and after his indictment and guilty plea. *Id*. at 1243 (explaining that "restitution paid after adjudication of guilt is not a forbidden factor . . . ."). Moreover, the fact that Mr. Rodriguez has the ability to make restitution should not be held against him:

> [A] defendant . . . should be judged by his actions. The fact that he
> may have some economic means should neither be held for him or

2

> against him.  To suggest that when a defendant is affluent, his
> attempts at restitution can never qualify as an exceptional
> circumstance[] is as repugnant to equal protection ideology as to
> hold the lack of ability to make restitution against an indigent
> defendant.  It is clear that in some cases, the *methods* by which a
> defendant makes restitution may qualify as an exceptional
> circumstance, above and beyond what is considered in the
> Guidelines.

*Id.* (quoting *United States v. DeMonte*, 25 F. 3d 343, 355 (6th Cir. 1994) (Celebrezze, J.,

concurring in part and dissenting in part) (emphasis in original)).

Notably, there are no "concrete legal rules with which to determine whether particular

payments of restitution are extraordinary enough to warrant downward departures . . . ." *Id*. at

1244.  Instead, the Eleventh Circuit directs courts to consider "a wide range of factors, such as

the degree of voluntariness, the efforts to which a defendant went to make restitution, the

percentage of funds restored, the timing of the restitution, and whether the defendant's motive

demonstrates sincere remorse and acceptance of responsibility."

*Kim* illustrates the application of these factors.  Kim and his wife were part of a scheme to

defraud the Special Supplemental Food Program for Women, Infants, and Children (WIC).  *Id*. at

1238.  As part of the scheme, the Kims bought unclaimed WIC vouchers which they then resold

through their retail establishment.  *Id*.  The scheme lasted about three years, during which the

Kims and two others pocketed $268,237.03.  *Id*.  The Kims received approximately two-thirds of

the fraudulently obtained funds.  *Id*.  At their change of plea hearing, the Kims tendered $50,000

in personal funds as restitution.  *Id*.  The Kims repaid the remaining amount before they were

sentenced.  *Id*.  The Kims explained that they went to significant lengths to obtain the restitution

funds, including contacting family and friends, signing promissory notes, and withdrawing

money from their own savings account.  *Id*.

The Government opposed the departure on the ground that the Kims did not pay restitution until after their indictment, and only then as part of a negotiated plea agreement. *Id*. at 1244. The Government argued that the Kims were motivated by their desire for a reduced sentence. *Id*. Rejecting the Government's claim, the Eleventh Circuit noted that the Kims "personally benefitted from only about two-thirds of the $268,037.18 loss, yet they provided restitution for the entire loss caused by the fraud." *Id*. The Court stressed that the Kims paid about 140 percent of the amount from which they personally benefited. *Id*. at 1245. "Even though [the Kims] had agreed to pay restitution for the whole amount of the fraud in their plea agreement, the fact that they made and carried out their commitment to pay back money they never received simply demonstrates their extraordinary remorse." *Id*.

The Court also recognized the Kims' collective efforts in raising the necessary funds. The couple "came up with this money by liquidating three-fourths of their life savings and obtaining nearly $200,000 in loans from friends and family." *Id*. The Court added that Mrs. Kim would not have pled guilty and borrowed nearly $200,000 "except to show her extreme remorse." *Id*. The Kims began making restitution on the day they were adjudicated guilty and completed payment before sentencing. *Id*. According to the Court, the Kims were "the rare defendants who demonstrated their extraordinary remorse and acceptance of responsibility by making extraordinary restitution." *Id*.

There are significant parallels between the Kims and Mr. Rodriguez. Like the Kims, Mr. Rodriguez did not personally benefit from the full $5 million investment at issue here. At most, he collected approximately $240,000 in salary. This represents approximately 5 percent of the hedge fund's investment. Notably, when the company's board offered him an additional $100,000 bonus, Mr. Rodriguez declined the money. Nevertheless, Mr. Rodriguez agreed to

4

personally repay the full $5 million investment.  To further ensure that the hedge fund would be repaid, Mr. Rodriguez also agreed to turn over any of the proceeds he would have otherwise received from the sale of KidoZen.  In an effort to make the hedge fund whole, Mr. Rodriguez further tendered the vast majority of his stock in KidoZen to the hedge fund.  Finally, as relevant here, Mr. Rodriguez also agreed to assign any intellectual property rights held by him to KidoZen.

Unlike the Kims, however, Mr. Rodriguez agreed to make full and complete restitution *well before* he even knew about this criminal case.  After the misstatements at issue here came to light, Mr. Rodriguez met with the hedge fund's representatives and counsel.  At that meeting, Mr. Rodriguez personally agreed to repay the full amount of the investment.  He signed a civil settlement agreement drafted by the hedge fund; he agreed to a repayment scheduled set down by the hedge fund; and he authorized the entry of a judgment for the full amount of the hedge fund's investment in case he defaulted.  All of this occurred before Mr. Rodriguez knew or even had reason to suspect that he would be indicted and arrested weeks later.

Consistent with the payment terms contained in the civil settlement agreement, Mr. Rodriguez made an initial payment of $100,000, followed by two payments of $35,000.  At the start of these proceedings, Mr. Rodriguez's personal accounts were frozen, thereby temporarily limiting his ability to continue to make payments under the original agreement.  In the ensuing months, however, Mr. Rodriguez has continued to work and recently tendered $200,000 in additional restitution.  [DE-31-¶13].  These monies represent Mr. Rodriguez's personal earnings. While the Court in *Kim* praised the defendants' efforts to ask their friends and families for money to repay the Government, Mr. Rodriguez should also be acknowledged for personally shouldering the responsibility to pay back the hedge fund.  Indeed, the Government knows that

Mr. Rodriguez is prepared to continue making payments under the original civil settlement agreement and has even offered to increase the rate of repayment.

Like the Kims, Mr. Rodriguez has demonstrated his extreme remorse and acceptance of responsibility by agreeing to make full and complete restitution.  If the timing of the Kims' agreement to pay suggests a desire to curry favor with the sentencing court, Mr. Rodriguez's decision to make full restitution indicates a pure desire to simply make things right.  Mr. Rodriguez agreed to repay the hedge fund before he knew about this indictment, before he was arrested, and certainly before he pled guilty.

### 2.   The Loss Amount Overstates the Seriousness of the Offense

While Mr. Rodriguez does not deny the loss amount as calculated by the Guidelines, he does believe that it overstates the seriousness of his offense.   The Presentence Investigation Report ("PSR") indicates that Mr. Rodriguez "is accountable for a loss of $5,000,000."  [DE-29-¶26].  Because this amount is more than $2,500,000 but less than $7,000,000, his base offense level is increased by 18 levels.   USSG §2B1.1(b)(1)(J).   The 18-point increase, however, overstates the seriousness of Mr. Rodriguez's conduct here.  In *U.S. v. Redemann*, 295 F. Supp. 2d 887, 898-99 (E.D. Wisconsin 2003), the district court recognized that in cases "in which the loss determination results in an offense level that substantially overstates the severity of the offense, the court may depart."  This is "an encouraged basis for departure."  *Id*. (quoting *United States v. Corry*, 206 F. 3d 748, 751 (7th Circ. 2000)).

The Eighth Circuit's decision in *United States v. Oligmueller*, 198 F. 3d 669 (8th Cir. 1999), is instructive as to when a departure is warranted.  In *Oligmueller*, the Government appealed the district court's sentence following the defendant's guilty plea to two counts of making false and fraudulent statements to a FDIC insured bank.  *Id.* at 670.  Oligmueller

misrepresented the amount of cattle he owned in order to secure a loan. *Id.* The bank discovered the fraud while trying to inspect the collateral. *Id.* Oligmueller admitted to lying about the number of cattle. *Id.*

At the time the bank discovered the fraud, Oligmueller owed approximately $894,000 on a loan secured by livestock, feed, and machinery. *Id.* The bank did not have a mortgage on Oligmueller's real property. *Id.* To repay the bank, Oligmueller began liquidating his assets in September of 1997. *Id.* By October of 1998, Oligmueller had repaid the bank approximately $808,000, thereby reducing the bank's loss to approximately $58,000. *Id.* At the sentencing hearing, the district court determined that the bank's actual loss was $58,000 and the intended loss was zero. *Id.* at 671. The Eighth Circuit affirmed finding that "[t]here is no evidence that, at the time of the fraudulent conduct, Oligmueller intended to repay anything less than the full value of the loans." *Id.*

Here, Mr. Rodriguez has agreed to make full and complete restitution. Even before the Government initiated this prosecution, Mr. Rodriguez had already entered into a civil settlement agreement with the victim hedge fund. The Presentence Investigation Report recognizes that Mr. Rodriguez signed the agreement with the hedge fund in March of 2015. [DE-29-¶18]. Under its terms, Mr. Rodriguez "agreed to pay back the $5,000,000 and took steps to begin payment." *Id.* To further ensure that the hedge fund would be made whole as quickly as possible, Mr. Rodriguez voluntarily pledged the majority of his shares in KidoZen to the hedge fund. *Id.* Like the defendant in *Oligmueller*, Mr. Rodriguez took immediate and significant steps to repay the hedge fund.

The Guidelines also overstate the seriousness of the offense because Mr. Rodriguez's fraud was "for little or no gain, especially in comparison to the size of the loss." *Id.* In *Redemann*, for

example, the district court noted that the defendant's gain "was miniscule compared to the total amount taken. *Redemann*, 295 F. Supp. 2d at 900. *Redeman* cited to the Third Circuit's decision in *United States v. Stuart*, 22 F. 3d 76 (3d Cir. 1994). In *Stuart*, the appellate court recognized that there may be circumstances where "strict application of the loss tables can overstate the seriousness of the offense." *Stuart*, 22 F. 3d at 83. Applying this logic, courts have repeatedly departed downward from the loss amounts prescribed by the guidelines where the amount of gain realized is comparatively less than the actual loss. *See e.g.*, *U.S. v. Forchette*, 220 F. Supp. 2d 914, 926 (E.D. Wisconsin 2002) (departing where defendant's gain was minimal compared to loss amount); *U.S. v. Costello*, 16 F. Supp. 2d 36, 39 (D. Mass. 1998) (granting downward departure based on the extent of the disproportion between the loss to the victim and the gain to the defendant.).

In addition to comparing the total gain to the actual loss amount, the district court in *Forchette*, also recognized that certain other aspects of a defendant's conduct may warrant a downward departure from the loss amount set by the guidelines. The court noted that the defendant's intent in involving himself in the scheme may have been significantly different than of the usual fraud defendant, e.g. he may have entered the scheme with honest intentions or with the intent to make good on his obligations . . . ." *Forchette*, 220 F. Supp. 2d at 925. Here, the PSR notes that "[i]n mid-2013, Kidozen needed money to grow. As a result, [Mr. Rodrigeuz] solicited investors, including a New York-based hedge fund." [DE-29-¶12]. Unlike the typical fraud defendant, Mr. Rodriguez did not pocket most, or even all, of the hedge fund's investment. In fact, of the monies invested, he collected approximately $240,000 in salary, *id*., and declined an additional $100,000 bonus offered to him by KidoZen's board. The remaining funds were

used to pay other legitimate business expenses.  As the PSR confirms, Mr. Rodriguez used the money "to pay, among other things, $1,600,000 in payroll . . . ."  [DE-29-¶17].

In addition to agreeing to fully repay the hedge fund's $5 million investment in KidoZen, Mr. Rodriguez also pledged the majority of his shares in the company.  Mr. Rodriguez pledged these shares as an additional viable option for making the hedge fund whole.  At the time that hedge fund invested in KidoZen, Mr. Rodriguez was the majority shareholder, owning approximately 62 percent of the company's total shares.  After signing the civil settlement agreement, Mr. Rodriguez voluntarily relinquished the bulk of his ownership stake in the company, retaining only 6.7 percent of KidoZen's shares.  In other words, not only did Mr. Rodriguez agree to fully repay the hedge fund, he forfeited a substantial portion of his interest in his company, thereby further ensuring that the hedge fund would be made whole through a subsequent sale.

## C. This Court Should Also Grant Mr. Rodriguez A Downward Variance Based On the Section 3353(a) Factors

### 1. This Offense Represents a One-Time Aberration in an Otherwise Exemplary Life

In *United States v. Adelson*, 441 F. Supp. Ed 506, 513-14 (S.D.N.Y.), the District Court noted:

> [S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.  This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, the history and characteristics of the defendant.

As further demonstrated below, Jesus Manuel Rodriguez's personal history and individual characteristics paint a picture of a man who lives for his family and his work.  His crime, as the

Court will see, was an aberration in what has been – and will be – an extraordinary life.  Mr. Rodriguez's wife, Mariela, sees her husband as the embodiment of the American Dream.  The facts below give meaning to this sometimes overused phrase.

*Growing Up in Cuba.*  Mr. Rodriguez was born on May 16, 1979 in Villa Clara, Cuba. He is an only child.  His parents, Jesus and Laura Rodriguez were well-respected physicians and well-known opponents of the Castro regime.  As a boy, Mr. Rodriguez's parents urged him not tie himself to the Cuban government.  This advice would set him on his eventual path to Miami. For a boy like Mr. Rodriguez, there could be no future outside of the Communist Party and the Castro regime.  Mr. Rodriguez immigrated to the United States on January 20, 2005 and today is a U.S. citizen.  Both of Mr. Rodriguez's elderly parents live in Miami in a home their son purchased.  In addition to their mortgage, Mr. Rodriguez pays their living expenses.  His father now works as a registered nurse and will soon be retiring.  His mother works as a hematologist technician.

*His Education.*  Mr. Rodriguez began playing chess at the age of four.  His paternal grandfather taught him to play.  Mr. Rodriguez excelled at the game, winning two silver medals in national championships in Cuba.  One day, his father sat him down to discuss his future.  Mr. Rodriguez dreamed of becoming a chess champion.  But his father had a different idea.  Mr. Rodriguez remembers his father telling him that it was time to focus on his studies.  "You will never be a champion," his father told Mr. Rodriguez.  Heeding his father's words, Mr. Rodriguez abandoned his dream and focused all of his considerable energies and talents on his school work. Some may be inclined to view Mr. Rodriguez's father harshly.  How could a father end his son's dream at such an early age?  Why not encourage him to practice and get better?  Why now push him to chase his dream, even if it would later prove unrealistic?  The answer is simple.  Mr.

Rodriguez's father saw a raw talent in his son.  A talent that would help him build a better life outside of Cuba.  And, as time passed, Mr. Rodriguez's father turned out to be right.

In the ninth grade, Mr. Rodriguez won a gold medal in math and physics.  He would continue to win the gold medal in mathematics every year throughout high school.  As a result, he won admission to one of Cuba's elite secondary schools.  Mr. Rodriguez would be in class nearly twelve hours each day, from 7:00 a.m. to 7:00 p.m.  He maintained this rigorous schedule through the end of high school.  During this period, Mr. Rodriguez lived at school, away from his family.

In college, Mr. Rodriguez continued to excel academically.  He began working in a technology lab where he focused his research on multi-player video games.  Mr. Rodriguez, however, was not an avid video game player.  Computer science in Cuba during this period was, in Mr. Rodriguez's words, archaic.  He focused on video games because the underlying technology was new to Cuba.  Mr. Rodriguez recalled spending sixty to seventy hours in the lab writing code.  He thrived on the intellectual challenge and developed a strong work ethic. Eventually, his research expanded into the field of cybersecurity – a skill he would use in the post-9/11 era when he went to work for defense contractor Lockheed-Martin.

During his second year in college, Mr. Rodriguez also began to publish articles and launched a personal blog that received approximately 10,000 visitors every day.  As graduation neared, Mr. Rodriguez started to receive job offers from Google, Microsoft, and Amazon. Initially, Mr. Rodriguez considered accepting a position with a company in Canada.  Eventually, the family settled in the United States.

*His Work.*  Mr. Rodriguez arrived in Miami in January of 2005.  He lived in a one-bedroom apartment in South Miami with his father.  His mother would not be able to join them

for nearly three years.  While his father, a doctor in Cuba, studied to become a registered nurse, Mr. Rodriguez began his career as a technologist.  Initially, he worked as a consultant for Microsoft product teams.  After only six months in the U.S., he joined TwoConnect as one of its first employees, while also continuing to work for Microsoft.  Mr. Rodriguez remained at TwoConnect until 2008.  By the time he left, Mr. Rodriguez was essentially running the company.

Mr. Rodriguez left TwoConnect in order to devote more time to speaking and writing. He continued to consult, now also working for Google, Goldman Sachs, and JetBlue.  In addition to his work in the private sector, Mr. Rodriguez also took on consulting assignments for the U.S. Government.  In the aftermath of the 9/11 attacks, Congress enacted legislation mandating the creation of one information-technology department for all agencies housed within the newly-created Department of Homeland Security.  Lockheed-Martin won the contract to integrate the various departments.  The company hired Mr. Rodriguez as a cybersecurity architect and consultant for the project.

At the end of 2008, Mr. Rodriguez, along with two colleagues from Microsoft, formed Tellago.  One of Mr. Rodriguez's co-founders would later leave the company to care for a sick child.  His other co-founder remained until July 2012, when she passed away after a short battle with cancer.  Mr. Rodriguez and his team eventually grew the company to several hundred employees.  In 2011, American Business named Tellago the Best Tech Professional Services Firm in the U.S.  The following year, Inc. Magazine named Tellago the Best Tech Professional Services Firm in the U.S.  In 2012, Tellago created KidoZen, the company at issue here.

In addition to his private work, Mr. Rodriguez has long been involved with Venture Hive, a technology accelerator and incubator in Miami.  Venture Hive offers entrepreneurs and start-

ups a variety of services, including education and mentorship.  For several years, Mr. Rodriguez has mentored entrepreneurs at Venture Hive and has personally sponsored various educational programs at the center.   Mr. Rodriguez also sits on numerous corporate boards where he advises founders and other board members on various aspects of product development, launch strategy, and other aspects of start-up operations.   Finally, Mr. Rodriguez is a columnist for several technology publications including CIO.com.

*Mr. Rodriguez Marries and Tries to Start a Family.*  In the summer of 2012, a friend re-introduced Mr. Rodriguez to Mariela Pino-Rodriguez.  The two first met in high school and later attended the same university in Cuba.  After Mr. Rodriguez moved to the United States, the two lost contact.  Eventually, a mutual friend would reunite the two in Miami.  In February of 2015, Mr. Rodriguez proposed.  The couple married eight months later, hours after Mr. Rodriguez was released on bond in this matter.  Both Mr. Rodriguez and his wife want children.  Unfortunately, their efforts have been blocked by two miscarriages.   In February of 2016, Mrs. Rodriguez suffered her first miscarriage.  Mrs. Rodriguez learned that she was pregnant again during the pendency of these proceedings.  Unfortunately, she suffered a second miscarriage just before her husband was due to be sentenced here.  This time, Mrs. Rodriguez had to undergo surgery to address ongoing medical issues related to her second, failed pregnancy.

## 2.  Mr. Rodriguez's Family Is Completely Dependent Upon His Support

The Sentencing Guidelines provide that "family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted." USSG §5H1.6, p.s.  The Commission's use of the word "ordinarily," however suggests a "soft policy statement, rather than one with unequivocal language."  *United States v. Johnson*, 964 F. 2d 124, 129 (2nd Cir. 1992).  Said differently, "[i]f the Commission had intended an absolute rule that family

circumstances may never be taken into account in any way, it would have said so." *Id*. at 129. "The clear implication," explained the Second Circuit in *Johnson*, "is that if the court finds that the circumstances related to family ties and relationships are extraordinary, it is not precluded as a matter of law from taking them into account in making a downward departure." *Id*.

While Mr. Rodriguez's family circumstances may not be strong enough to warrant a traditional downward departure, they do merit consideration as part of this Court's analysis of the section 3553(a) factors. Without Mr. Rodriguez, his small family will suffer. His elderly parents depend on Mr. Rodriguez for financial and psychological support. Likewise, Mr. Rodriguez's wife depends on her husband to a significant degree. She has no other family in the United States, other than Mr. Rodriguez. While she is a trained architect, she stopped working in order to navigate the challenges of what would have been a difficult pregnancy, had it not ended prematurely a second time. Put simply, Mrs. Rodriguez is greatly dependent on her husband for psychological support at this time.

### 3. The Nature and Circumstances of the Offense

***The Crime.*** On September 10, 2015, the Government filed a one-count, six-page Indictment, charging Mr. Rodriguez with wire fraud in violation of 18 U.S.C. § 1343. [DE-3]. Less than five months later, on February 4, 2016, Mr. Rodriguez plead guilty to the Indictment. [DE-25 and 26]. This case arises out of Mr. Rodriguez's efforts to raise capital for his technology-based start-up company, KidoZen. As alleged in the Indictment, Mr. Rodriguez made four misrepresentations in connection with his efforts to obtain investment capital. Mr. Rodriguez misrepresented that KidoZen (1) had over 58 paying customers, including many customers who were paying money directly into the company's bank account; (2) consistently earned high profits selling services to its customers; (3) had approximately $1.2 million in

reserves in a bank account; and (4) received a letter of intent from a large technology company offering to purchase KidoZen for approximately $50 million. As a result of these misrepresentations, the victim, a New York-based hedge fund, invested $5 million dollars in KidoZen.

**Mr. Rodriguez Admits His Guilt.** When the hedge fund discovered Mr. Rodriguez's misstatements, it summoned him to a meeting at its offices in New York. Mr. Rodriguez willingly and without counsel travelled to New York to meet with representatives of the hedge fund as well as its lawyer. Over the course of a day-long meeting, Mr. Rodriguez met with Timothy Lash (Managing Director and Head of Technology, Media, and Telecom at Third Point), Robert Schwartz (Managing Director at Third Point and a member of the KidoZen board of directors), and the hedge fund's lawyer. Sitting by himself, Mr. Rodriguez admitted to the charged conduct. At some point during the meeting, the hedge fund's lawyer handed Mr. Rodriguez a draft civil settlement agreement which outlined how Mr. Rodriguez would personally repay the hedge fund's investment in KidoZen. Within twenty-four hours, Mr. Rodriguez signed and returned the agreement. He did not seek the advice of counsel before signing the agreement. He signed because he believed it was the right thing to do.

### 4. The Need for the Sentence Imposed

#### a. To Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

A sentence of probation with confinement in the form of house arrest will more than adequately reflect the seriousness of the offense here, promote respect for the law, and provide just punishment. Mr. Rodriguez has not denied the seriousness of his offense. Well before he was indicted and arrested, he admitted his wrongdoing and immediately took steps to repay the victim hedge fund in full. Mr. Rodriguez's efforts came before he even knew he would be

criminally charged and evidence his remorse and desire to redress his criminal conduct. Following his arrest, Mr. Rodriguez admitted his misconduct to the FBI and later to this Court as part of his plea agreement.  At the sentencing hearing, Mr. Rodriguez will again address the Court and public accept responsibility for his wrongdoing.

In *United States v. Anderson*, 533 F. 3d 623, 633 (8th Cir. 2008), the Eighth Circuit affirmed a downward variance based on "other ways in which the defendant had suffered atypical punishment such as the loss of his reputation and his company, the ongoing case against him from the Securities and Exchange Commission and the harm visited upon his as a result of the fact that his actions brought his wife and friend into the criminal justice system."   As in *Anderson*, Mr. Rodriguez has also been punished in the form of reputational damage and embarrassment.  Many of his colleagues have distanced himself from him in the preceding months.  He has been a topic of discussion within his industry and among other professionals who have followed this case and commented on it in social media.  Notably, Mr. Rodriguez has accepted this public shaming.  He has offered to create and fund a clinic through which other entrepreneurs will receive guidance and representation regarding the legal requirements of raising capital.  As the face of the clinic, Mr. Rodriguez will place himself and his misdeeds on full display for the community-at-large in an effort to teach by example.

### b.  To Afford Adequate Deterrence to Criminal Conduct

For more than a decade, sentences for convicted fraudsters have substantially increased. The news media has assiduously reported the results of these prosecutions thereby exposing the public in general and white-collar defendants in particular to the substantial risk of imprisonment for lengthy periods of time if they commit crimes of this nature.  As one commentator observed:

> In general, sentences for financial crimes are much longer and
> harsher today than they were in the 1980s and 1990s . . . Part of the

> change in sentences has to do with the publicity of fraud cases and the victims of fraud. In earlier years, stockholders and corporate victims were largely nameless and faceless to the general public. But as more ordinary consumers became involved in the stock market through their retirement accounts, they see a personal connection to the fraud.[1]

In cases where a corporate officer enriches himself personally at the expense of the corporation or his investors, a sentence of the magnitude contemplated by the guidelines might be necessary to provide general deterrence. This case, however, is different. Even before he knew that he was under investigation, that the Government would ultimately seek an indictment, and that he would be arrested just hours before his wedding, Mr. Rodriguez admitted his misconduct and agreed to repay the full amount of the hedge fund's investment in KidoZen.

### c.   To Protect the Public from Further Crimes by Mr. Rodriguez

A Guidelines sentence of 41 to 51 months is wholly unnecessary to protect the public from future crimes, especially given the fact that Mr. Rodriguez has zero criminal history points. Last month, the U.S. Sentencing Commission released a comprehensive study of recidivism among federal offenders. Notably, the Commission found that an offender's "criminal history was closely correlated with recidivism rates." *See* U.S. Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview*, at 5 (March 2016). The Commission found that those offenders who had zero criminal history points posed the lowest risk of recidivism. *Id*. at 18. Indeed, the Commission determined that "recidivism rates are most closely correlated with total criminal history points." *Id*. at 18. Thus, Mr. Rodriguez poses the lowest possible risk of recidivism, and creates the lowest possible need to protect the public.

---

[1]      *Crime and Punishment: Sentencing in Financial Fraud Cases*, Wisconsin Law Journal (Dec. 17, 2007) (wislawjournal.com/2007/12/17/crime-and-punishment-sentencing-in-financial-fraud-cases/) (last visited April 25, 2016).

Mr. Rodriguez's race/ethnicity and educational level also suggest that he poses a low risk of recidivism. With respect to race, the Commission found that Hispanics posed a 17.8% probability of recidivism compared to Whites at 43.7% and Blacks at 33.9%. *Id*. at 9. The only other category less prone to recidivism based on this factor was defined simply as "Other" with a 4.6% risk of recidivism. *Id.* Mr. Rodriguez's educational history also suggests that he poses a low risk of recidivism. In studying this factor, the Commission grouped offenders into four different categories: (1) "Less Than High School Graduate," (2) "High School Graduate," (3) "Some College,' and (4) "College Graduate." *Id*. Of these groups, those offenders who graduated from college posed the lowest risk of recidivism at 7.5%. *Id*.; *see also id*. at 24. As noted above, Mr. Rodriguez not only completed college, he graduated at the top of his class in his department, as well as all other majors at the university.

Although "[t]here is not a strong correspondence between final offense level and recidivism," *id*. at 20, the statistics are also instructive here. As the Commission found, "the type of crime committed does have some correlation with the risk of a future crime." *Id*. at 20. That said, the Commission also found that of the federal offense types it surveyed, fraud had the lowest risk of recidivism at 34.2%. *Id*. at 20. Finally, it should be noted that the Commission also found that "[r]ecidivism rates differ according to the type of sentence imposed." *Id*. at 22. Most significantly, "[o]ffenders released from incarceration in 2005 had a rearrest rate of 52.5%, while offenders released directly to a probationary sentence had a rearrest rate of 35.1%." *Id.* at 5*; see also id*. at 22.

### d. To Provide Jesus with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner

Mr. Rodriguez does not need any particular educational or vocational training.  He holds a degree in the field of computer science and is a well-known and well-respected software engineer.  Mr. Rodriguez has won numerous awards for his work.  If anything, a prison sentence would actually put Mr. Rodriguez behind the technological curve.  Furthermore, Mr. Rodriguez is not in need of any medical care or drug treatment.  Any sentence the Court considers should take into account the fact that Mr. Rodriguez will not qualify for the Residential Drug Abuse Program because he has never abused drugs or alcohol.

### e. The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

Following *Booker*, most courts look to "*national* disparities between defendants with similar criminal histories convicted of similar conduct . . . ."  *United States v. Conaster*, 514 F. 3d 508, 521 (6th Cir. 2008).  The unique facts of this case allow the Court to sentence Mr. Rodriguez to probation with house arrest without creating any unwarranted disparities.  In many ways, Mr. Rodriguez is in a singular category.  He has no criminal history points which places him among the least likely to reoffend.  He offered to repay the victim hedge fund in full before he even knew about this criminal case.  As evidence of his willingness to repay the hedge fund, Mr. Rodriguez entered into a civil settlement agreement that included an aggressive payment schedule.  To that end, Mr. Rodriguez has already made significant payments.  These factors, as well as those discussed throughout this memorandum set Mr. Rodriguez apart from the typical fraudster and ensure that a probationary sentence will not create unwanted disparities at the national level.

19

**f.   The Need to Provide Restitution to the Victims**

Mr. Rodriguez is in a position to make full and complete restitution.  As noted above, Mr. Rodriguez agreed to repay the hedge fund its full investment well before his arrest, indictment, and subsequent plea.  Prior to his arrest, and based on the payment schedule set out by the hedge fund, Mr. Rodriguez paid approximately $17,000.  Following his plea of guilty, Mr. Rodriguez tendered an additional $200,000 in restitution.  Mr. Rodriguez is prepared to continue paying the hedge fund until such time as it is made whole.  Critically, it is Mr. Rodriguez's continued employment that will allow him to continue paying the hedge fund.

<u>**CONCLUSION**</u>

"The weight given to any specific § 3553(a) factor is committed to the sound discretion of the district court."  *United States v. Croteau*, 2016 WL 1399456 *13 (11th Cir. April 11, 2016) (citing *United States v. Clay*, 483 F. 3d 739, 743 (11th Cir. 2007)).  This Court "has considerable discretion in deciding whether the § 3553(a) factors justify a variance and the extent of such a variance."  *Id*. at *13 (citing *United States v. Cubero*, 754 F.3d 888, 892 (11th Cir. 2014)).  The grounds laid out for departure along with the application of the 3553(a) factors to the facts of this case justify a probationary sentence.

Respectfully submitted this 28th day of April, 2016.

ALVAREZ | GONZALEZ, LLP
Museum Tower
150 West Flagler Street
Suite 1675
Miami, Florida 33130

By:____/s/ Carlos F. Gonzalez_____
        CARLOS F. GONZALEZ

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on April 28, 2016, I electronically filed the foregoing with the

Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this

day on all counsel of record identified on the attached Service List, either via transmission of

Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those

counsel or parties who are not authorized to receive electronically Notices of Electronic Filing:

H. Ron Davidson
United States Attorney's Office
99 NE 4 Street
Miami, FL 33132
305-961-9405
Fax: 305-536-4699
h.ron.davidson@usdoj.gov

21